### DANIEL EKSTEDT v. VILLAGE OF NEW HOPE AND ANOTHER.
### JOHN OBERREUTER v. SAME.

193 N. W. 2d 821.

January 7, 1972—Nos. 42992, 42993.

---

*William J. Corrick,* Village Attorney, *Robert J. Miller,* Assistant Village Attorney, and *James W. Torke* and *O. C. Adamson II,* for appellants.

*Robins, Meshbesher, Singer & Spence* and *Ronald I. Meshbesher* and *Patrick Delaney,* for respondent Ekstedt.

*Phillip A. Cole,* for respondent Oberreuter.

Heard before Knutson, C. J., and Murphy, Kelly, and Hachey, JJ.

RONALD E. HACHEY, JUSTICE.*

This is an appeal from a judgment of the trial court reversing the determination made by the personnel board of the village of New Hope which had upheld and sustained the action taken by the village council in discharging respondents, Daniel Ekstedt and John Oberreuter from their duties as policemen. The action of the village council was based upon written statements, prepared and submitted to their superior officer by respondents, which were determined to have contained language offensive toward fellow public employees, created a situation of incompatibility between respondents and their supervisors and fellow employees, and constituted just cause for dismissal. On appeal, the trial court determined that the decision of the personnel board was not reasonably supported by the evidence and that the dismissals violated various statutory rights of the respondents. The court ordered that they be reinstated to their former positions with back pay. We affirm.

Prior to the summer of 1969, there was dissension within the police department of the village. Some of the disputes were publicized, and some of the heated arguments among police personnel were heard by the citizenry of the village. At one point, Officer Eckstedt had been suspended for a period of 5 days for having made remarks about the chief of police. Various members of the police department had engaged in the practice of relating the departmental disputes to news media. A grievance procedure had been in effect for more than a year and had been made known to all members of the police department. The disputes and dissension finally resulted in a split of the Policemen's Benevolence Associa-

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

tion and the formation of a new one called New Hope Police Federation in the summer of 1969. After the split, the police force was divided approximately evenly between the two organizations.

Prior to July 9, 1969, during a period of bitter discontent, respondents, as president and vice president of the federation, drafted 15 pages of resolutions which dealt with various aspects of the police department, certain members thereof, and various incidents. Three of the resolutions [1] were found by the personnel board to

---

[1] Resolution found on page 11 of the resolutions reads: "THE NEW HOPE POLICE OFFICERS FEDERATION WISHES TO QUESTION THE PROPOSED APPOINTMENT OF DETECTIVE MORSE TO THE POSITION OF STAFF SERGEANT, WITHOUT BEING REQUIRED TO TAKE ANY TYPE OF EXAMINATION. THIS SEEMS TO BE IN DIRECT CONFLICT WITH THE CIVIL SERVICE GUIDELINES WE HAVE BEEN LED TO BELIEVE APPLIES TO ALL VILLAGE EMPLOYEES. WE FEEL THAT DETECTIVE MORSE'S POLICE EXPERIENCE AND EDUCATION ARE NOT SO VAST AS TO OVERSHADOW OTHER MEMBERS OF THE DEPARTMENT WHO UNDER CIVIL SERVICE REQUIREMENTS, SHOULD ALSO BE ELIGIBLE. TO THE KNOWLEDGE OF ANYONE IN THIS ORGANIZATION DETECTIVE MORSE HAS NEVER TAKEN A COMPETITIVE EXAMINATION FOR ANY PROMOTION HE HAS RECEIVED ON THIS DEPARTMENT, INCLUDING HIS APPOINTMENT TO THE FORCE. WE FEEL THAT THIS IS PRIME EXAMPLE (AMONG MANY) OF THE FAVORITISM THAT HAS BEEN ENJOYED BY DETECTIVE MORSE DURING HIS TENURE OF EMPLOYMENT BY THE VILLAGE OF NEW HOPE."

Resolution found on page 12 of the resolutions reads: "THE NEW HOPE POLICE OFFICERS FEDERATION REQUESTS THAT A COMPLETE PSYCHIATRIC EVALUATION BE CONDUCTED ON SERGEANT LOWELL CAMPBELL. WE FEEL THAT THIS IS OF THE UTMOST IMPORTANCE TO THE WELFARE OF THE INDIVIDUAL MEMBERS OF THE POLICE DEPARTMENT AND THE SAFETY OF THE GENERAL COMMUNITY. WE FURTHER FEEL THAT OVER THE PAST YEARS, THIS MAN HAS EXHIBITED ABNORMAL TRAITS AND BEHAVIOR TO THE EXTENT THAT IT HAS [A]FFECTED THE WELL BEING OF CITIZENS BOTH DIRECTLY AND INDIRECTLY; AND HAS JEOPARDIZED THE SAFETY AS WELL AS HELPED TO SERIOUSLY UNDERMINE THE MORAL OF MEMBERS OF THE DEPARTMENT. THIS SITUATION HAS REPEATEDLY BEEN BROUGHT TO THE ATTENTION OF THE ADMINISTRATION, WITH EITHER NO ACTION BEING TAKEN OR NEGATIVE ACTIONS BEING THE ONLY RESULTS. FOR EXAMPLE ONE OFFICER WAS GIVEN A FORMAL LETTER OF REPRIMAND FOR INSUBORDINATION AFTER SUBMITTING A WRITTEN COMPLAINT, REGARDING AN OUTRAGEOUS INCIDENT IN WHICH THE SERGEANT LOUDLY AND PUBLICLY INSULTED HIM ON SUCH INANE ISSUES THAT THE SELF RESPECT OF THE ENTIRE DEPARTMENT DEMANDED THAT SOME ACTION BE TAKEN.

constitute just cause for dismissal. Rough drafts of the resolutions were shown to other members of the newly formed federation.[2] No formal meeting had approved the resolutions, but each of the

"WE HOPE AND TRUST THAT POSITIVE ACTION WILL BE FORTHCOMING ON THIS MATTER, ESPECIALLY IN VIEW OF THE FACT THAT PSYCHOLOGICAL EXAMINES, OF A LESSER INTENSITY, HAVE BEEN USED REGULARLY, AS OF LATE, AS A PART OF BOTH THE HIRING AND PROMOTIONAL TESTING."

Resolution found on page 14 of the resolutions reads: "THE NEW HOPE POLICE FEDERATION WISHES TO MAKE IT UNDERSTOOD THAT IT DISAGREES WITH THE NEW HOPE VILLAGE MANAGER (MR. LARSON) ON HIS ATTITUDE AND APPROACH TO THE PROBLEMS THAT CONFRONT THE NEW HOPE POLICE DEPARTMENT. IN A MEETING ON JUNE 17, 1969, MR. LARSON REFERRED TO THE EFFORTS OF THE NEW HOPE POLICE OFFICERS TO UPGRADE THE DEPARTMENT AS 'GARBAGE'. THE ENTIRE PATROL SECTION OF THE NEW HOPE POLICE DEPARTMENT ON MAY, 1968 TOOK ITS GRIEVANCE TO THE MANAGER, AND VILLAGE COUNCIL. AT A MEETING THE PATROLMEN WERE REPRESENTED BY TWO OFFICERS. AS A RESULT OF THIS MEETING UNIFORMS OF THE DEPARTMENT WERE CHANGED FROM GREEN TO BLUE, AND THE SHOTGUNS WERE TAKEN OUT OF THE TRUNK OF THE SQUAD AND PLACED INSIDE THE SQUAD. THE WHOLE POINT OF THE MEETING WAS LOST. IT WAS THE DESIRE OF THE PATROLMEN TO UPGRADE THE ADMINISTRATION WHO HAVE FAILED IN ITS RESPONSIBILITY NOT ONLY TO THE POLICE OFFICERS OF NEW HOPE BUT TO THE CITIZENS OF NEW HOPE WHO SUPPORT THEM WITH THEIR TAX DOLLARS.

"IN OTHER 'RESOLUTIONS' BY THE FEDERATION, CRITICISM OF THE ADMINISTRATION CAN BE NOTED BUT THIS IS IN DEALING WITH DIFFERENT AREAS OF COMMUNICATION WITH PERSONNEL, WE HOPE WITH THIS 'RESOLUTION' TO POINT OUT THAT IN MR. LARSON'S ATTEMPT TO REORGANIZE THE POLICE DEPARTMENT, THAT HE HAS LEFT THE SAME ADMINISTRATORS IN THEIR COMPARATIVE SAME POSITIONS LEAVING THE DEPARTMENT IN THE SAME PREDICAMENT AS BEFORE. IT MUST BE OBVIOUS THAT THE JOBS HAVE OUTGROWN THE MEN WHO ARE INCAPABLE OF HANDLING THEM. IT IS UNDERSTOOD BY THE FEDERATION THAT MR. LARSON DOES HAVE THE AUTHORITY TO MAKE RECOMMENDATIONS TO THE PROPER AUTHORITY FOR PLACEMENT OF MANAGEMENT. THE ONLY CONCLUSION THE MEMBERS OF THE FEDERATION CAN COME TO IS THAT MR. LARSON CONDONES THE ACTIONS OF THE ADMINISTRATION IN ITS INEPT HANDLING OF THE POLICE DEPARTMENT."

[2] There was no showing that, in fact, such an organization had actually been formed before July 9, 1969. No charter or bylaws appeared to exist and no general organization meetings or elections were shown to have occurred.

members contacted gave individual approval of the substance of the resolutions. Several felt, however, that they could have been worded more tactfully.

On July 9, 1969, a copy of the resolutions was submitted to a police sergeant, along with a request that it be sent to the mayor and village council. The copy was given to the chief of police, who made an additional copy thereof and delivered the original to the village manager. Six additional copies were requested by the village manager. The following morning, July 10, two newspaper reporters received copies of the resolutions in their mail. There is no evidence in the record which will support a finding as to who mailed the copies to the news media. During the days that followed, several officers who had seen a rough draft of the resolutions prepared statements repudiating any inference of being associated with respondents. On July 14, however, the whole federation met and retroactively approved the resolutions.

Pursuant to a suggestion by the respondents, the village manager forwarded the resolutions directly to the village council, thereby bypassing the personnel board. On July 14, the council met and determined that respondents be dismissed for the reasons hereinabove stated. A hearing before the personnel board followed in the months of August and September, resulting in findings and conclusions which affirmed the action of the village council. Pursuant to the provisions of Minn. St. 44.09, both the appeal to the district court and the appeal to this court were taken. Respondent Eckstedt is a veteran and is entitled to the benefits of Minn. St. 197.46.

■ Appellants argue that respondents showed bad faith because they did not follow proper grievance procedures. Proper procedure would have been to go through the police chain of command, then to the village manager, and, finally, to the civil service commission. The order setting forth this policy is not explicit. It does contain a diagram of the chain of command, which does not include the civil service commission. The only reference thereto is one sentence, which states: "The only lateral movement that

can be made from the 'chain' would be from the Manager to the Civil Service Commission." Examination of the record indicates that respondents did not request a hearing before the commission before the matter went to the village council. The village manager, however, could have informed respondents of the proper procedures at the time that the resolutions were brought to him, but he did not do so. It further appears that it was the village manager who bypassed the civil service commission by directly submitting the resolutions to the village council. Under the circumstances we fail to find bad faith on the part of respondents.

■ In finding No. 12, the personnel board found that resolutions on pages 11 and 12 were published with reckless disregard for the truth of the factual assertions therein. As to the truth of the resolution on page 11, Detective Morse admitted that he had not taken a test when he joined the force and was uncertain as to whether or not he took one upon becoming a full-time officer. He did take a test before becoming a detective. It is not clear whether the personnel board considered the resolution as relating to a reclassification of job title or relating to a promotion. Of primary significance is the fact that respondents and all of the officers of the federation thought the resolution was truthful. When this actual belief is coupled with a finding that two of the three allegations about the lack of tests were true, it seems impossible to conclude that they were made with reckless disregard for the truth. Hence, we conclude that the board's finding No. 12 relating to the resolution on page 11 was not supported by the evidence.

The resolution found on page 12 states in part:

> "THE NEW HOPE POLICE OFFICERS FEDERATION REQUESTS THAT A COMPLETE PSYCHIATRIC EVALUATION BE CONDUCTED ON SERGEANT LOWELL CAMPBELL. WE FEEL THAT THIS IS OF THE UTMOST IMPORTANCE TO THE WELFARE OF THE INDIVIDUAL MEMBERS OF THE POLICE DEPARTMENT AND THE SAFETY OF THE GENERAL COMMUNITY. WE FURTHER FEEL THAT OVER THE PAST YEARS, THIS MAN HAS EXHIBITED ABNORMAL TRAITS

AND BEHAVIOR TO THE EXTENT THAT IT HAS [A]FFECTED THE WELL BEING OF CITIZENS BOTH DIRECTLY AND INDIRECTLY."

The record shows that Sergeant Campbell had never been given the psychological test required of persons more recently employed on the police force. The resolution requested a psychiatric "evaluation." By some method, not explained, the board equated "evaluation" with treatment. There was no mention of treatment in the resolution. The board itself referred to uncontradicted testimony concerning approximately 12 incidents relating to claimed acts of abnormal or irregular behavior on the part of Campbell, but concluded that there was no indication that he had exhibited traits or tendencies remotely similar to those indicated in the resolutions. Those acts and others testified to made men working under Campbell somewhat apprehensive. The board found that the language "complete psychiatric evaluation" and "abnormal traits and behavior" was published and submitted with the actual intent of injuring Campbell. As the trial court pointed out in its memorandum, almost every grievance in employer-employee relations, especially if it is directed to or criticizes a superior, may be interpreted as having the intent of injuring to some degree the superior. We agree with the trial court in finding and concluding that the request for psychiatric examination was not made with reckless disregard for the truth.

With respect to the resolution on page 14, the board seems to have found that the village manager and the administration had not been inept in handling personnel problems in the police department and seems to have concluded that such characterization in the context of the grievance procedure violates the duty of loyal people to their employer. There was no specific finding on this resolution nor was any reference thereto made in the conclusions of law by the board. There was, however, a reference in the memorandum. The resolution does not specifically apply the word "inept" to the village manager, but that seems relatively unimportant. Of real significance is the fact that the resolution related to terms and conditions of employment by police personnel in the village.

Viewing the record as a whole, we conclude that the board's findings of fact that the resolutions on pages 11 and 12 were published with reckless disregard of the truth of the factual assertions therein, and the board's conclusions that these resolutions and the one on page 14 constitute misconduct, are not substantiated by the evidence.

■ Minn. St. 179.52 states that nothing in the statute limiting the right of public employees to strike can be construed to limit their right to the expression or communication of a view, grievance, complaint, or opinion on any matter related to the conditions or compensation of public employment or their betterment, so long as the same is not designed to and does not interfere with the full, faithful, and proper performance of the duties of employment. Section 179.53 provides:

"No person exercising any authority, supervision or direction over any public employee shall have the power to authorize, approve or consent to a strike by one or more public employees and such person shall not authorize, approve, or consent to such strike, *nor shall any person discharge, demote, or cause any public employee to be discharged, or demoted, or separated from his employment because of participation in the submission of a grievance.*" (Italics supplied.)

The italicized language is unequivocal. It clearly states that respondents cannot be discharged if their resolutions can be characterized as grievances.

The word "grievance" is not defined under Minnesota statutory law. In Forrest Industries, Inc. v. Local Union No. 3-436 Int. Woodworkers, 266 F. Supp. 265, 268 (D. Ore. 1966), the court discussed the word "grievance" as follows:

"There are varying interpretations of what actually constitutes a 'grievance.' Some seem to infer that the term refers to collective rather than individual or group complaints, or to major demands relative to wages, hours and working conditions. [Citations omitted.] However, other cases indicate that minor matters or second-

ary disputes (in contrast to broad issues such as wages, hours and working conditions) constitute a 'grievance.' "

The term "grievance" as used in collective bargaining agreements is not a term of art having a meaning separate and apart from its meaning in ordinary use. See, Gillam v. Roadway Express, Inc. 1 Ohio App. 2d 548, 206 N. E. 2d 34 (1965); Butte Miners' Union No. 1. v. Anaconda Co. 159 F. Supp. 431 (D. Mont. 1958); Pacific T. & T. Co. v. Communication Workers, 199 F. Supp. 689 (D. Ore. 1961). A liberal and broad construction of the term "grievance" as used in collective bargaining agreements should be given in the interest of encouraging the use of machinery which has been set up for peaceful settlement of disputes. Forrest Industries, Inc. v. Local Union No. 3-436 Int. Woodworkers, *supra*. As used in a statute providing for the mediation of grievances, the word should be defined in its generally accepted sense. Labor Mediation Board v. Jackson County Road Commrs. 365 Mich. 645, 114 N. W. 2d 183 (1962). It appears reasonable to conclude that the Minnesota statutory reference relates to some complaint related to terms or conditions of employment.

Respondents were discharged because the personnel board, in effect, found that the employees were mistaken or in error in the allegations, complaints, and opinions expressed in their resolutions. It does not seem reasonable that such finding could amount to discharge for just cause. As stated in the trial court's memorandum:

"But certainly the resolutions cannot be held not to be grievances because appellants and other officers were mistaken in their views and opinions. Disputes exist because of differences in views and opinions and disputes lead to grievances in public employment. If employees are to be discharged or otherwise penalized because they are mistaken or because the employing or reviewing authorities do not agree with views, complaints or opinions expressed, no employee or labor organization could safely submit any grievance and the protection contemplated by the statute

relative to submission of grievances would be completely nullified. So obviously the fact that appellants were mistaken or wrong in the views expressed does not justify their discharge for submission of any of the resolutions here involved."

We agree with the trial court's finding that the resolutions in question come within the statutory purview of grievances and that those grievances cannot be removed from the protective provisions of the pertinent statutes because of a finding that respondents were mistaken in their views and opinions.

■ The test to be applied by the district court on review of employee-dismissal hearings is set forth in Minn. St. 44.09, subd. 2, which provides in part:

"* * * The question to be determined by the court shall be: 'Was the order of the personnel board reasonably supported by the evidence?' "

Under the applicable statutes the respondents could only be discharged for just cause or for misconduct. Minn. St. 44.08, 197.46. There does not appear to be any significant difference between those two phrases; hence, the standards to be applied to them are similar. In Gibson v. Civil Service Board, 285 Minn. 123, 171 N. W. 2d 712 (1969), and Hagen v. State Civil Service Board, 282 Minn. 296, 164 N. W. 2d 629 (1969), the term "just cause" was discussed, and both cases quote language from State ex rel. Hart v. Common Council, 53 Minn. 238, 244, 55 N. W. 118, 120 (1893), as follows:

"* * * 'Cause,' or 'sufficient cause,' means 'legal cause,' and not any cause which the council may think sufficient. The cause must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public. The cause must be one touching the qualifications of the officer or his performance of its duties, showing that he is not a fit or proper person to hold the office. An attempt to remove an

officer for any cause not affecting his competency or fitness would be an excess of power, and equivalent to an arbitrary removal. In the absence of any statutory specification the sufficiency of the cause should be determined with reference to the character of the office, and the qualifications necessary to fill it."

In Hagen, the court explained the language in State ex rel. Hart v. Common Council, *supra,* and stated (282 Minn. 299, 164 N. W. 2d 632):

"Under this definition it appears that the cause or reason for dismissal must relate to the manner in which the employee performs his duties, and the evidence showing the existence of reasons for dismissal must be substantial."

Upon a review of the record, there appears to be no evidence which would support the charge that respondents had performed their duties as police officers in an inadequate fashion. The chief of police, on the contrary, testified that there had never been any serious complaints about respondent Ekstedt's performance of his duties as a police officer. This appears to be the only testimony offered concerning their conduct while on duty. The activity described as misconduct by the personnel board consisted of submitting a list of resolutions together with a request that they be considered through the chain of command. Apparently, those resolutions were labeled misconduct by the board because they contained inferences which were uncomplimentary to superior officers and which resulted in personality clashes. The allegations were serious in nature, and it was natural that animosity would arise. This can, and usually does, follow in almost any incident involving the submission of a grievance. However, to dismiss an employee for that reason, or because a superior officer's feelings or pride might be hurt, would be tantamount to a defeat of the entire policy of protecting subordinate employees in the submission of grievances.

■ Appellants contend that the trial court went beyond the proper scope of review. The general rule pertaining to adminis-

trative agency review provides that the court's role is very limited. See, Swenson v. Civil Service Comm. 276 Minn. 532, 534, 151 N. W. 2d 254, 257 (1967). The court made its own findings of fact and conclusions of law in the instant case and specifically ordered that respondents be reinstated to their former positions with back pay. This is not necessarily improper. In the Gibson case we pointed out (285 Minn. 126, 171 N. W. 2d 714):

"This court has made it clear in cases involving the functioning of the Civil Service Board that the scope of review in matters of this kind must necessarily be narrowly limited. * * * An appellate court is justified in interfering with an administrative agency's decision only where it appears that the agency has not kept within its jurisdiction; that it has proceeded upon an erroneous theory of law; or that its actions are arbitrary and unreasonable or not supported by substantial evidence on the record as a whole."

It clearly appears from the record here that the personnel board proceeded on an erroneous theory of law when it misconstrued the proper meaning of the terms "just cause," "misconduct," and "grievance."

Ordinarily the district court would not be justified in interfering with the decision of the administrative agency, and generally the court does not substitute its findings of fact for those of the agency. Nor does the court generally direct the agency, upon reversal of its determination, as to the precise course it shall pursue. However, the court's decision on matters of law is binding upon the agency, and it can, by writ of mandamus, compel performance of a judicially determined mandatory duty rather than remand to the agency for further proceedings according to law. State ex rel. Spurck v. Civil Service Board, 226 Minn. 240, 251, 32 N. W. 2d 574, 581 (1948). See, also, Bryan v. Community State Bank, 285 Minn. 226, 233, 172 N. W. 2d 771, 776 (1969). Here, if there were a remand to the personnel board, there would be no facts for determination regarding whether

or not respondents should be rehired. Respondents' rights to their former positions appear as a matter of law. If upon remand the board made findings contrary to those of the trial court, such findings would amount to an error of law. State ex rel. Spurck v. Civil Service Board, *supra*. Hence, we hold that the judgment of the trial court in interfering with the decision of the board was proper. To remand for further proceedings would be fruitless.

Affirmed.