**Thomas C. VAN HOOF, Appellant,**

v.

**CITY OF BURNSVILLE, et al., Respondents.**

**No. 48228.**

Supreme Court of Minnesota.

Jan. 19, 1979.

Mansur & Mansur and Daniel B. O'Leary, St. Paul, for appellant.

Grannis & Grannis, Vance V. Grannis, Roger N. Knutson, and Patrick A. Farrell, South St. Paul, for respondents.

Robert M. Wattson, MCLU Volunteer Atty., Patsy D. Reinard, Legal Counsel, Minnesota Civil Liberties Union, Minneapolis, for amicus curiae.

Heard before SHERAN, C. J., and PETERSON and SCOTT, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

This is an appeal from an order of the district court of Dakota County discharging a writ of certiorari to the city council of the City of Burnsville. Thomas Van Hoof petitioned for the writ to seek review of the council's decision to uphold an order of the Burnsville city manager terminating Van Hoof as a public safety officer. We reverse.

Van Hoof's termination took place during an ongoing dispute between officers of the Burnsville Department of Public Safety and the city over Burnsville's policy of having off-duty officers respond to fire calls. In order to provide adequate personnel at fires, a Department regulation required each Burnsville public safety officer to respond to seven percent of the fire calls during his off-duty hours. However, in December, 1976, the Director of the Department of Public Safety informed the officers that no disciplinary action would be taken against those not meeting the seven percent requirement. The officers complained that this posed the danger that there would eventually be a fire to which no officers or too few officers would respond and created a morale problem, since some officers were responding and others were not.

On March 21, 1977, the Burnsville city council met to consider a proposal designed to improve this fire protection situation. The mayor opened the meeting up for comments by citizens, and Van Hoof, as president of the American Federation of State, County and Municipal Employees local, responded. He expressed his belief that the council's proposal was inadequate, and the meeting became rather heated.

At one point, after telling the council that only three female officers had responded to a recent apartment fire, Van Hoof stated: "If it comes to a choice of saving myself or to save someone else, I'm going to save myself. I don't know how many more fires I can go to." Later, when the city manager stated that the public safety officers had failed to live up to their side of the bargain and that he was merely asking that they do the job they were hired to do, Van Hoof replied: "Fine. By city ordinance and by your own policy and by the director's statement, we work forty hours a week, and that's it."

Following the meeting, Van Hoof and about twenty-five other officers met in a local bar. None of these officers responded to a fire call broadcast at this time, and supervisory personnel had to handle the emergency. Van Hoof testified that he had put his radio monitor in his car after having three drinks and did not hear the call.

Later that evening at his home, Van Hoof received a call from a reporter from the *Minneapolis Star*, and a lengthy conversation ensued. The next day the *Star* published an article on the council meeting, and attributed the following statements to Van Hoof:

"* * * that he and other officers either have been or are planning to unilaterally reduce their availability by shutting off their radio monitors at certain times.

"Officers will continue to 'play the game' by dragging their heels in reporting to fire calls until the calls are canceled."

That same day, March 22, 1977, the city manager suspended Van Hoof for 30 days with pay. The notice of suspension stated that Van Hoof was being disciplined for the following reasons:

"1. Public statements made by you that you are unwilling to carry out your duties as a Public Safety Officer.

1. Under Burnsville Ordinance 1–6–29, an employee can be discharged only for cause. This court has interpreted "cause" in the past in a manner that could be relevant to this case. See *Ekstedt v. New Hope*, 292 Minn. 152, 193 N.W.2d 821 (1972) and *Hagen v. State Civil*

"2. Public statements made by you that you intend 'to drag your feet' in responding to fire emergencies and that you will from time to time turn off your radio monitor so that you can not be reached to respond to emergency calls.

"3. Public statements made by you which indicate that you are engaging and intend in the future to engage in unlawful strike contrary to M.S.A. 179 and the Burnsville City Code.

"4. That your total conduct as reflected in your public statements and actions indicates that you are unwilling and unable to perform your duties as a Public Safety Officer and that your conduct has endangered and will endanger the public health, safety and welfare."

On April 19, 1977, the city manager discharged Van Hoof for the reasons set forth in the suspension notice.

Van Hoof then exercised his right under Burnsville Ordinance 1–6–30 to have the city council review the manager's action. The council held a hearing on April 28, 1977, and on May 2, 1977, issued Findings of Fact and Conclusions upholding the discharge and basically adopting the manager's reasons. Van Hoof next petitioned the district court, which conducted an independent review of the record and held that the record supported the council's findings and that Van Hoof's due process and other constitutional rights had not been denied.

Our holding to the contrary is based upon a factual evaluation. While acknowledging the deference to be accorded the factual determinations of a political entity, we come inescapably to the conclusion that there is insufficient evidence supporting the reasons given by the city council and city manager for Van Hoof's termination. We discuss each of these four reasons in turn:[1]

"1. Public statements made by you that you are unwilling to carry out your duties as a Public Safety Officer."

*Service Board*, 282 Minn. 296, 164 N.W.2d 629 (1969). However, our opinion in the instant case is based solely on the inaccuracy of the city's reasons and makes no comment upon whether they come within these judicial definitions of "cause."

■ None of Van Hoof's public statements, of which four have been singled out by the city, indicate unwillingness to perform his duties. We have concluded they are acknowledgements of present conditions rather than refusals to carry out future responsibilities. The first statement, made at the council meeting, was: "If it comes to a choice of saving myself or to save someone else, I'm going to save myself." This statement obviously reflects a particular unwillingness, but not to perform duties. Bluntly, no fireman has the *duty* to sacrifice his life for another's. While not a particularly tactful expression to one's employer, nor an announcement especially designed to reassure the people of Burnsville of the commitment of their firefighters,[2] this statement does not support the city's first reason—particularly made in the context of a description of the recent apartment fire to which only three female officers had responded.

The next statement was also made at the council meeting: "Fine. By city ordinance and by your own policy and by the director's statement, we work forty hours a week, and that's it." We find that this statement also does not indicate unwillingness, particularly when considered in conjunction with Van Hoof's *actions*—he had never refused to comply with the off-duty response policy, and his response rate for 1976 was 12% and to date in 1977 was 20%. His statement reflects the officers' feeling that one of the reasons the off-duty system was ineffective was because it had not been enforced since December of 1976. Rather than constituting a *refusal* to work more than forty hours, the statement appears to convey Van Hoof's complaint that the officers were in fact not being *required* to work more than forty hours. It is true that the city manager testified that the 7% response requirement had never been waived and was still very much in effect, but this seems irrelevant if Van Hoof was expressing his reasonable belief to the contrary. If

wrong, he should have been corrected, not fired. In fact, if the city was uncertain at the time about whether Van Hoof was or was not refusing to respond to off-duty fire calls, he could simply have been asked. At the council's review hearing, Van Hoof's response to the question of whether he would comply with any and all directives of the city manager and public safety director was: "Absolutely." His further response to the question of whether he had complied with such directives was: "Yes, I have, sir." Seen in this light, Van Hoof's public statement conveys less an unwillingness than a willingness to follow *specified* policy.

The third and fourth public statements by Van Hoof appeared in the *Star* article:

"* * * that he and other officers either have been or are planning to unilaterally reduce their availability by shutting off their radio monitors at certain times."

and

"Officers will continue to 'play the game' by dragging their heels in reporting to fire calls until the calls are canceled."

An initial uncertainty exists concerning what weight, if any, should be given unacknowledged newspaper quotes. The city council received an affidavit from the reporter that the article was accurate, but he refused to be cross-examined. Even accepting the article as a valid summary of actual remarks made by Van Hoof, however, it is not clear that the statements are anything but a critical reflection of the current state of affairs. According to his reasonable and completely uncontradicted testimony, Van Hoof had explained to the reporter that the system was not working *now* because officers *were* turning off their radios and *were* dragging their feet in order to get show-up credit while actually arriving after a fire was over. And they would *unfortunately* continue to do so in the future. Van Hoof's testimony was that he himself was under-

2. The effect of Van Hoof's statements upon the public have not been considered by the court because adverse public impact was not listed by the city as a reason for termination. We therefore offer no opinion as to whether a fireman making statements undermining public confidence in the city's fire protection could be justifiably discharged for "cause."

standably turning off his radio only when drinking or out of town. The statements thus are in effect: "This system won't work because of the evident current and probable future conduct of public safety officers" rather than "I, Van Hoof, as union leader, am advocating and planning these activities." Given the ambiguity of these statements and the questionable reliability of a newspaper quote, Van Hoof should have been asked to acknowledge these statements, to explain what, if anything, was being planned, and to specify what his role would be. As it is, the newspaper story is insufficient grounds in and of itself to show unwillingness on Van Hoof's part to perform duties.

Generally, then, we find nowhere in Van Hoof's public statements the unwillingness to perform duties relied upon by the city in its first reason for his discharge.

"2. Public statements made by you that you intend 'to drag your feet' in responding to fire emergencies and that you will from time to time turn off your radio monitor so that you can not be reached to respond to emergency calls."

■ As noted above, this reason is based upon the newspaper article, a source of questionable reliability. Beyond this, however, the article says not Van Hoof himself but "officers" will continue to "drag their heels." Similarly, there is no indication that Van Hoof himself would shut off his monitor in contravention of Department policy, though others may have been doing so. Van Hoof's testimony that his monitor was shut off only while he was drinking or out of town stands as uncontradicted factually and uncontested as an unreasonable or objectionable practice.

"3. Public statements made by you which indicate that you are engaging and intend in the future to engage in unlawful strike contrary to M.S.A. 179 and the Burnsville City Code."

■ This reason is actually a restatement of the city's second reason for if Van Hoof had actually been planning to shut off his monitor, "drag his heels" and lead the rest of the Department in doing so, this may

well have constituted an unlawful slow-down or strike. However, just as these newspaper quotes do not indicate that Van Hoof himself intended to not perform his duties, they also do not indicate that he was advocating such non-performance by others. There is simply no evidence to bridge the gap between neutral acknowledgement of such conduct and partisan encouragement of it.

"4. That your total conduct as reflected in your public statements and actions indicates that you are unwilling and unable to perform your duties as a Public Safety Officer and that your conduct has endangered and will endanger the public health, safety and welfare."

■ This is the only reason referring to "conduct" and "actions" as opposed to statements. The city is on even more speculative ground here, because there is abundant evidence that Van Hoof was not only a satisfactory but an exemplary officer—appreciated by citizens, trusted by his colleagues, and respected by his superiors, including the man who fired him. There is no evidence that he had ever shirked his duties or defied orders.

We have already discussed our conclusion that Van Hoof's statements do not reflect unwillingness. We do not believe the city seriously claims he was "unable" to perform his duties. The only possible suggestion of this is his statement: "I don't know how many more fires I can go to," which was obviously made in a rhetorical flourish. There is absolutely no evidence of actual inability. Finally, the only way Van Hoof's conduct could "endanger the public health, safety and welfare" would be through strike activity. His statements, as discussed, do not indicate such activity, and there is a complete lack of evidence linking him to the mass non-response of the 25 officers to the fire call after the council meeting on March 21st.

Thus, we have found the city's reasons for Van Hoof's termination factually inaccurate. Our conclusions have been reached in spite of an appreciation that at the time things may have looked different from the

perspective of the city manager, charged with the responsibility of dealing with a difficult situation. In the midst of a controversy over fire protection, the union president makes some inflammatory statements at a city council meeting, and the whole department fails to show up at the very next fire call. The next day's paper brings additional statements that could suggest more defiance. It probably appeared to the manager that a strike was imminent and drastic action was essential. Thus, Van Hoof's suspension and eventual termination. In fact, the manager reacted further, that evening seeking a temporary restraining order against the whole Department.

█ However, if public employees are to be protected by a rule of law and not to serve solely at the pleasure of management, even such an understandably hasty response cannot be allowed to stand if completely unsupported by facts available at the time. Belief in an imminent strike may have been absolutely accurate and reasonable at the time; what was incorrect was the corresponding assumption that the fault lay with Van Hoof. Thomas Van Hoof categorically denied "intending" himself, "suggesting" or "encouraging" other members of the Burnsville Public Safety Department to engage in strike activities, and this testimony stands uncontradicted by any evidence presented to the city council. Therefore, the decision of the district court must be reversed and the case remanded with instructions that the Burnsville city council be ordered to reinstate Van Hoof with back pay to April 19, 1977.[3]

Reversed and remanded.

OTIS, J., took no part in the consideration or decision of this case.

---

3. Because of our holding, we do not consider the further issues raised by appellant.