Gabor **DELI**, Relator,

Katalin **DELI**, Relator,

v.

UNIVERSITY OF MINNESOTA,
Respondent.

Nos. C7–93–951, C2–93–954.

Court of Appeals of Minnesota.

Jan. 25, 1994.

Review Denied March 23, 1994.

Robert E. Oliphant, St. Paul, for Gabor Deli.

Ronald I. Meshbesher, Jack S. Nordby, Meshbesher & Spence, Ltd., Minneapolis, for Katalin Deli.

Mark R. Rotenberg, Gen. Counsel, Mark A. Bohnhorst, Julie A. Sweitzer, Associate Gen. Counsels, Minneapolis, for University of Minnesota.

Considered and decided by HUSPENI, P.J., and HARTEN and FLEMING, JJ.

## OPINION

WILLIAM J. FLEMING, Judge.*

Relators Katalin Deli and Gabor Deli were discharged from their employment at the respondent University of Minnesota by Chris Voelz, Director of the Women's Inter-collegiate Athletics. Their separate grievances contesting Voelz's decision were consolidated, and a hearing was held before a three-person panel appointed by the University's Academic Staff Advisory Committee.

In letters to University President Nils Hasselmo, the panel concluded that Gabor Deli's termination should be upheld, but that just cause for Katalin Deli's termination did not exist. The panel recommended that Katalin Deli be reinstated.

President Hasselmo recused himself from review of the panel's recommendations, and appointed Elton A. Kuderer, Chairman of the Board of Regents, to issue final decisions in the matters. Following his review of the record, Regent Kuderer concluded that just cause existed for both dismissals.

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

Katalin and Gabor Deli have filed separate petitions for certiorari, which have been consolidated by this court. They question whether "just cause" existed for their dismissals and whether the procedures which were followed were fair. We affirm the University's decisions.

## FACTS

Husband and wife Gabor and Katalin Deli emigrated to the United States from Hungary in 1971. In 1973, Katalin Deli became the head women's gymnastics coach at the University. Gabor Deli was hired in 1976 as an assistant gymnastics coach.

On July 1, 1990, Katalin Deli's contract was renewed for a three-year term. The contract specifically stated Katalin Deli's employment was governed by University rules and regulations "as fully described in that certain policy manual entitled *University of Minnesota Academic Professional and Administrative Staff Policies and Procedures,* * * * (the 'Manual')".

The contract further provided that it could be terminated by the University "in accordance with the policies and procedures contained in the Manual." The Manual, in turn, provided that an employee could be dismissed for "just cause." While the Manual did not specifically define just cause, it was defined by Katalin Deli's contract as including but not limited to various violations of NCAA rules or

e. Failure by Deli to perform the duties assigned under the terms of this Agreement.

Katalin Deli's duties under the contract included "[p]ositively representing the University and the University's athletic programs in private and public forums" and "[s]uch other duties as may be assigned by the Director."

Gabor Deli had a year-to-year appointment with the University. Gabor Deli's appointment was also governed by the Manual. Under its terms, he could be terminated for just cause prior to the expiration date of his appointment. As already noted, the Manual

pointment pursuant to Minn. Const. art. VI, § 10.

did not define "just cause." Absent just cause, Gabor Deli was entitled to written notice of nonrenewal prior to the end date of his appointment and, based on his years of service, 12–months' pay.

In March 1992, Voelz learned of an incident in which a videotape containing sexually explicit scenes of the Delis had been distributed and viewed by several student athletes. Voelz began an informal investigation of the incident; over the next few months, she interviewed student athletes and the Delis. Voelz found that the video had been made by Gabor Deli without his wife's knowledge. Voelz concluded that just cause existed to discharge both of the Delis from their employment.

Before the prehearing conference on the Delis' grievances, the University submitted a list of potential witnesses and copies of its proposed exhibits, which included the notes of Voelz's investigation. At the prehearing conference, the panel requested additional documentation, including

4) Reports, letters, etc. involving disciplinary action taken by the University of Minnesota over the past four years involving coaches in both men's and women's athletic programs.
(Provided anonymously)

5) A list of persons in the *Academic Professional* employment category fired for "just cause" at the University of Minnesota over the past five years.

The panel reminded the parties that it "is only empowered to make a decision on whether there was just cause for the dismissals and whether University policies and procedures were followed." The panel further clarified that it would follow the *University of Minnesota Academic Professional and Administrative Personnel Rules of Procedure for Grievance Appeals, July 1987* ("Rules").

## ISSUES

I. Were the procedures which were followed fair and unprejudicial?

II. Did the University provide clear and convincing evidence that Gabor and Katalin Deli were terminated for "just cause?"

## ANALYSIS

■ Our standard of review in certiorari proceedings is limited. We may only question whether jurisdiction was proper, whether the proceedings were regular and fair, and whether the decisions below were arbitrary, oppressive, unreasonable, fraudulent, made under an incorrect theory of law, or without any evidence to support it. *Dietz v. Dodge County,* 487 N.W.2d 237, 239 (Minn.1992).

### I.

■ A. The Delis argue that they were prejudiced by Voelz's failure to follow the proper procedure prior to terminating them. The Manual specifically states that an appointing authority must report to and seek the approval of the vice president of academic affairs prior to terminating a staff member for just cause. It further states that "*[n]o one* is authorized to orally change the policies and procedures set forth in this booklet." Voelz failed to obtain the approval of the senior vice president; rather, she reported the results of her investigation to President Hasselmo and obtained his approval prior to terminating the Delis.

■ Generally, an agency's decision which is made upon unlawful procedure mandates reversal only if a party's substantial rights have been prejudiced. *See Northern Messenger, Inc. v. Airport Couriers, Inc.,* 359 N.W.2d 302, 305 (Minn.App.1984). The Delis claim that they were prejudiced by Voelz's actions in not seeking the approval of the senior vice president. As Katalin Deli notes in her brief, the most telling statement is that made by Regent Kuderer when he acknowledges that "while it is possible, it is highly unlikely that the [senior vice president] would at any time disagree with the recommendations sanctioned by the President." She insists that had the senior vice president been consulted, he might have arrived at a different decision than Voelz or President Hasselmo. The Delis further argue that, by virtue of his regular approval of termination decisions, the senior vice president was in a position to evaluate their cases as compared to others and decide whether dismissal was the appropriate disposition.

According to the University, the procedure set out in the Manual was established before 1989, when department heads and the athletic directors reported to the senior vice president for academic affairs. In 1989, President Hasselmo directed that the men's and women's athletic directors report directly to him. Thus, President Hasselmo was Voelz's immediate supervisor; the senior vice president had no supervisory control over her. The University, however, fails to explain why the Manual, which was issued in 1990 and revised in 1991, was not amended to reflect this change.

The University further argues that extensive settlement discussions took place between it and the Delis prior to their termination. Since any such settlement would have to be approved by President Hasselmo, it was crucial that he be advised of Voelz's investigation and decisions. Again, this does not explain why Voelz did not seek the senior vice president's approval prior to terminating the Delis.

While we do not condone Voelz's disregard of the proper procedures, we conclude, as did the panel and Regent Kuderer, that her failure to obtain the approval of the senior vice president did not affect the eventual outcome of this case and did not prejudice the Delis. Under the Manual, Voelz could have obtained a "written variance" from the senior vice president to allow her to consult with President Hasselmo. There is nothing to suggest that this approval would have been withheld or otherwise denied, particularly given the fact that Voelz's direct supervisor was not the senior vice president, but President Hasselmo. Under these circumstances, we do not believe the Delis were substantially prejudiced by President Hasselmo's involvement in the decision to terminate them.

B. The Delis further challenge a number of the procedures followed during the grievance proceedings. They argue that the grievance proceeding was unfair and rendered them unable to effectively challenge the University's decisions to terminate them.

■ Due process requirements are met in a case such as this when a terminated teacher or employee is given

(1) clear and actual notice of the reasons for termination in sufficient detail to enable [the terminated teacher] to present evidence relating to them;

(2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges;

(3) a reasonable time and opportunity to present testimony in his or her own defense; and

(4) a hearing before an impartial board or tribunal.

*King v. University of Minn.,* 774 F.2d 224, 228 (8th Cir.1985) (quoting *Brouillette v. Board of Directors of Merged Area IX,* 519 F.2d 126, 128 (8th Cir.1975)), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1491, 89 L.Ed.2d 893 (1986).[1]

■ 1. The Delis first insist that the University failed to comply with Minn.Stat. § 181.933, subd. 1 (1990) (upon request by terminated employee, employer must inform employee in writing of "truthful reason for the termination"). The Delis further insist that the grievance procedures followed in this case failed to comply with the notice requirements established in *King,* 774 F.2d at 228.

In response to the Delis' requests for a more complete statement of the charges against them, the University submitted Voelz's termination letters. Prior to the pre-hearing conference, the University also submitted a list of potential witnesses and copies of its exhibits, which included notes of Voelz's interviews with the student athletes during her investigation. From these documents, the Delis could ascertain the specific nature and factual bases for the charges against them. *See Mueller v. Regents of Univ. of*

1. The Rules followed in this grievance proceeding are not the same as those followed in faculty tenure cases at the University. The procedures established for faculty tenure cases are more formal, and have been repeatedly upheld as consistent with due process concerns. *See, e.g.,*

*Mueller v. Regents of Univ. of Minn.,* 855 F.2d 555, 558–59 (8th Cir.1988); *Agarwal v. Regents of Univ. of Minn.,* 788 F.2d 504, 508 (8th Cir. 1986); *King,* 774 F.2d at 228; *Harford v. University of Minn.,* 494 N.W.2d 903, 909 (Minn.App. 1993), *pet. for rev. denied* (Minn. Mar. 30, 1993).

*Minn.*, 855 F.2d 555, 559 (8th Cir.1988) (notice letter need not restate details of charges and identity of accusers if such information is ascertainable from other documents and information which has already been provided).

■ 2. The Delis argue that they were prevented from conducting either formal or informal discovery prior to the hearing. As already noted, the parties exchanged lists of potential witnesses and copies of proposed exhibits prior to the hearing. Given the fact that the panel was limited to addressing whether just cause existed for the University's decisions and whether the proper procedures were followed, additional discovery was not crucial or necessary to the Delis' case. *See Surf & Sand Nursing Home v. Department of Human Servs.*, 422 N.W.2d 513, 520 (Minn.App.1988) (even where discovery is allowed, agency may decide not to allow it because no material or relevant information could be obtained from the discovery sought), *pet. for rev. denied* (Minn. June 23, 1988).

3. The Delis argue that they were hampered by their lack of subpoena power and were unable to compel witnesses to testify. The Delis have failed, however, to identify any witness whom they wished to call but who was unavailable or unwilling to testify. Indeed, the University issued a memo to its staff encouraging those with evidence relevant to the grievance proceedings to testify. In addition, a memo from President Hasselmo reassured staff that those who testified should do so truthfully and without fear of reprisal.

■ 4. The panel refused to allow the Delis to make their own tape recording of the proceedings. They insist that this was important, because it would have given them an opportunity to review previous testimony and because portions of the testimony are missing from the transcript.

There were, however, many individuals present at the hearings taking notes. If any missing testimony was crucial to their cases, the Delis could have prepared a statement under Minn.R.Civ.App.P. 110.03 or 110.04. While the record of the hearings in this case is not perfect, it is extensive, voluminous, and sufficient for our review.

■ 5. The Delis argue that they were prejudiced when the panel allowed the University to call several rebuttal witnesses who were not included in its original list of potential witnesses. Those witnesses included several women's coaches and a consultant. Because these witnesses were called for the sole purpose of rebutting the Delis' attack of Voelz's management style, they were not relevant to the issues decided by the panel.

■ 6. The Delis argue the panel improperly rejected computerized hearsay newspaper data, which showed the treatment afforded various coaches when they were subject to charges similar or identical to those involving the Delis. In particular, this data showed that several members of the coaching staff within the men's department had not been terminated or suspended after having violated NCAA rules.

The information sought to be admitted by the Delis is very similar to that contained in documents the University gave to the panel following the prehearing conference. The documents contain records of any disciplinary action over the previous four years taken against coaches in the men's and women's athletic programs, and a list of other persons in the Delis' employment category fired for "just cause" over the previous five years. The panel properly rejected the offered computerized newspaper data as cumulative and repetitive.

7. Gabor Deli argues he was barred from making appropriate inquiries into the backgrounds of the panel members so that he might challenge them for bias. While he could have challenged the membership of the panel under the Rules, however, he did not do so. In any event, there is no evidence suggesting any panel member was biased.

8. Gabor Deli argues he was prejudiced during the grievance hearing by the surprise injection of sexually oriented hearsay testimony by Voelz. Gabor Deli, however, did not object to Voelz's testimony during the hearing. In addition, her testimony regarding inappropriate conduct on his part did not affect the outcome of the proceeding; it was not cited by Voelz as a reason for her decision to terminate Gabor Deli, or by the panel

or Regent Kuderer as a basis for their decisions upholding Voelz's termination decision.

9. During the grievance proceeding, the Delis learned that the panel was being advised by an attorney who has represented the University for more than 20 years. The Delis argue that this attorney may have rendered partial advice to the panel because of his financial interest in continuing to. represent the University.

Apparently, the panel requested outside counsel to advise it on difficult legal issues that might arise. The record shows that the panel consulted with this attorney on a number of legal issues, including the drafting of a confidentiality agreement. It does not appear that the panel consulted with him regarding the ultimate issue in this case, whether just cause existed to terminate the Delis.

10. The panel rejected the Delis' attempt to name President Hasselmo as a respondent. The Delis claim that his testimony would have shown that a different employment standard was used in dismissing them than was used with other coaches. In addition, they insist that President Hasselmo played a major role in Voelz's decision to terminate the Delis. However, the Delis never actually requested that President Hasselmo appear as a witness. In addition, the evidence the panel requested fails to support the Delis' assertion that a different standard has been applied to other coaches.

## II.

■ Under the Rules, the University had the burden of proving just cause by clear and convincing evidence. In order to prove a claim by clear and convincing evidence, a party's evidence should be unequivocal and uncontradicted, and intrinsically probable and credible. *Kavanagh v. The Golden Rule,* 226 Minn. 510, 516–17, 33 N.W.2d 697, 700 (1948).

■ Minnesota courts have not adopted a standard definition of "just cause." The jury instruction guide offers the following definition of termination for good cause:

A termination is for good cause if the [employee] breached the standards of job performance established and uniformly applied by the [employer].

4 *Minnesota Practice,* CIVJIG 663 (Supp. 1993). By its terms, this definition of just cause contemplates that an employer treat employees uniformly when applying job standards. *Id.* Further, under this definition, the termination of an employee for any cause not affecting job performance or otherwise relating to job duties might be considered arbitrary and unreasonable. *See Ekstedt v. Village of New Hope,* 292 Minn. 152, 162–63, 193 N.W.2d 821, 827–28 (1972) (quoting *State ex rel. Hart v. Common Council,* 53 Minn. 238, 244, 55 N.W. 118, 120 (1893)).

■ A. With respect to the termination of Gabor Deli, the panel concluded only one of Voelz's reasons constituted just cause for his dismissal:

—Item # 1—You used University equipment to make videotapes of you and your wife engaged in sexual activity and distributed it to University of Minnesota women's gymnastics student-athletes on two separate occasions.

The panel only heard direct testimony related to the second incident. Although use of University equipment violates University policy, this in itself is not grounds for dismissal. The use of the term "distributed" may be incorrect; while Mr. Deli did not consciously distribute the videotape, he *allowed* it to be discovered by not taking steps to erase it or copy it onto another tape or otherwise prevent it from becoming available to others. Even though the other three items were not sufficient for termination, this incident alone would constitute just cause for dismissal.

The panel assumes the point of view that coaches and teachers must accept tremendous guidance responsibilities for their students and such irresponsible behavior cannot be tolerated.

(Emphasis in original.) In sustaining the panel's decision, Regent Kuderer found that the videotapings were done "intentionally" by Gabor Deli, that the tapings were done on a segment of tapes of gymnastics meets or events which "Gabor Deli knew would be reviewed by the student athletes," and that

Gabor Deli gave the videotapes to the students.

The evidence involving the making and distribution of the videotapes is largely undisputed: Gabor Deli admitted that he made the tapes without his wife's knowledge and that the only precaution he took to insure no one else would view the sex scenes was to leave blank spaces after the recorded gymnastics events. He further admitted that he gave the tapes to student athletes to review the gymnastics events.

We believe that this evidence establishes just cause for Gabor Deli's dismissal. Whether intended or not, such serious indiscretions by a person in Gabor Deli's position may be grounds for dismissal. A coach occupies a public position as an ambassador or representative for the University, and the University has a right to expect certain conduct of such persons. Conduct like that exhibited here only served to taint the University's reputation, and rendered Gabor Deli ineffective as its representative.

Perhaps more important, however, was Gabor Deli's role as a teacher of young people. As the panel noted, coaches "must accept tremendous guidance responsibilities for their students and such irresponsible behavior cannot be tolerated." Thus, we conclude that the University proved just cause to terminate Gabor Deli by clear and convincing evidence.

▬ B. With respect to Katalin Deli's grievance, the panel addressed three of the reasons for Voelz's decision, which the University identified as "significant." The panel concluded that none constituted just cause for termination:

—Item #2—In May 1991 Ms. Deli transported a transfer student athlete to the Olympic Academy in violation of NCAA rules. When an accident occurred in route to the Academy, Ms. Deli, in the presence of other team members, instructed the transfer student to lie about her identity.

The panel accepts that Ms. Deli probably told the student to lie and while Panel members do not condone this type of behavior, it in itself does not constitute just cause for termination.

—Item #6—Ms. Deli instructed team members in 1990–91 to tell Chris Voelz, Athletic Director, they were travelling to the Academy for practice only three times per week, when in fact they were travelling more often.

The testimony the Panel heard indicates there was great variability in the off-campus travel arrangements among the various coaches and teams. The women's athletic department was aware the van was being checked out every day and could have investigated this issue at any time. This seemed to be both a safety issue and an authority issue. There was an indication of insubordination; however there are other more appropriate options for handling this behavior and it does not constitute just cause for termination.

—Item #9—Ms. Deli failed to have a spotter in the gym at all times pursuant to Ms. Voelz'[s] directions.

As with the previous two charges, this seemed to be an issue of insubordination, yet there were also issues of safety that concern the Panel. Again, this was not sufficient for termination.

While Regent Kuderer made findings substantially similar to those made by the panel, he concluded that these three incidents constituted just cause for Katalin Deli's dismissal. In his attached memorandum, he explained:

Collegiate athletics are supposed to teach student athletes to play by the rules. The conduct of Katalin Deli in directing her students to lie to the Director and to law enforcement people is contrary to the rules and moral values of our society. Such an example is counter-productive, contrary, and just plain wrong. The University has a right to demand high ethical and moral standards and it is apparent from the facts brought forth before the Grievance Panel that Katalin Deli has not met those standards. Katalin Deli was in a position to build character in the student athletes by her example. Lying to authorities and violating the rules are not examples of character building and should not

be part of intercollegiate athletics. Her dismissal for cause was justified.

As with the evidence pertaining to the videotapes, the evidence involving these three incidents is relatively undisputed. The issue appears to be one not only of dishonesty, but also of insubordination. Both may be grounds for termination. *See, e.g., Mair v. Southern Minn. Broadcasting Co.,* 226 Minn. 137, 138–39, 32 N.W.2d 177, 178 (1948) (employee must obey reasonable orders that are not inconsistent with his employment contract); *Cherveny v. 10,000 Auto Parts,* 353 N.W.2d 685, 688 (Minn.App.1984) (employee's dishonesty in investigation by employer constitutes misconduct sufficient to disqualify employee from receiving unemployment benefits).

Again, we believe that this evidence establishes just cause for Katalin Deli's dismissal by clear and convincing evidence. While the panel obviously did not agree that Katalin Deli's conduct was serious enough to warrant dismissal, Voelz's decision was based on her belief that she could no longer trust or work with Katalin Deli. Voelz, who had been Katalin Deli's supervisor since 1988, should be given some discretion in determining whether Katalin Deli's conduct was serious enough to warrant dismissal or whether Voelz could continue to work with Katalin Deli to correct that conduct.

Finally, both of the Delis argue that the University's decisions are arbitrary and unreasonable because it treated them differently than it treated other coaches for similar violations of NCAA rules. The panel and Regent Kuderer, however, essentially agreed with the Delis that the alleged NCAA violations were of minor significance and did not constitute just cause for their terminations. The Delis do not argue that the University retained other coaches after conduct similar to making and distributing sexually explicit videotapes to students, as was the case with Gabor Deli. Neither do the Delis argue that the University retained other coaches after they refused to follow the athletic director's orders, or lied to the athletic director and instructed students to lie, as was the case with Katalin Deli. Indeed, as the panel concluded, the Delis' charges of discrimination were not supported by either the testimony adduced at the hearings or by the documentation provided to the panel.

## · DECISION

The University's decisions terminating Katalin and Gabor Deli for just cause are affirmed.

**Affirmed.**